Michael MARINO, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

NO. 2014–CA–001163–MR

Court of Appeals of Kentucky.

RENDERED: APRIL 29, 2016; 10:00 A.M.

Brief for Appellant: Jason A. Hart, Assistant Public Advocate, Frankfort, Kentucky.

Brief for Appellee: Jack Conway, Attorney General of Kentucky, Leilani K.M. Martin, Assistant Attorney General, Frankfort, Kentucky.

BEFORE: ACREE, CHIEF JUDGE; CLAYTON AND KRAMER, JUDGES.

## OPINION

KRAMER, JUDGE:

Michael Marino appeals the Nelson Circuit Court's judgment convicting him of first-degree rape and first-degree burglary. After a careful review of the record, we affirm because the saliva in the Styrofoam cup was constitutionally obtained and the subsequent evidence obtained from Marino's blood sample and the testing of it for DNA was not "fruit of the poisonous tree."

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2000, Bardstown Police Department Officer Barbara Roby investigated a sexual assault that was committed upon a bedridden resident of the Federal Hill Nursing Home.[1] The victim, Lorene Murphy, was an elderly woman more than eighty years old. The victim informed police that her assailant had broken into her room through the window, and she described the man as "tall, thin, biracial, or ethnic." A rape kit was conducted on her. The rape kit was sent to a laboratory for testing and it revealed that there was semen in her vagina. However, at that time, there was no definite suspect for the rape. Lorene Murphy died approximately one year following the incident.

Eight years after the rape, Captain William Strunk of the Bardstown Police Department informed Officer Roby (who was a detective by that time) that he had arrested Michael Marino on a burglary charge and that Marino fit the description of the suspect that Lorene Murphy had provided after she was sexually assaulted. Detective Roby then went to the Nelson County Jail to speak with Marino. She met with Marino in the jail's library. She had taken a Styrofoam cup with her to the jail, which she obtained from the Bardstown Police Department. Detective Roby asked Marino if he would like something to drink and she ensured that water was provided to Marino in the cup she brought

---

1. The facts of the case as set forth in this opinion which involve Officer/Detective Roby were taken from her testimony during the suppression hearing.

with her. She saw him drink the water from the cup. Detective Roby attempted to speak with Marino about the sexual assault allegations, but Marino refused to speak with her about them. After Marino refused to speak with her, he left the room. Detective Roby then took the Styrofoam cup, which Marino had left laying on the table, and placed it in a paper bag that she had taken with her. The cup was sent to a laboratory for DNA testing in the hopes that there would be saliva in the cup. Tests were conducted and the test result showed that the DNA in the cup matched the DNA found on the vaginal swabs taken from Lorene Murphy.

Detective Roby then called the laboratory technician, who told her that she needed a blood sample from Marino in order to perform a more thorough test on the DNA. Detective Roby obtained a search warrant to get a blood sample from Marino. She then obtained Marino's blood sample by getting a nurse at the jail where Marino was incarcerated to draw the blood. Detective Roby sent the blood sample to the laboratory, and she subsequently was informed that the DNA in the blood sample matched the DNA on the vaginal swabs taken from Lorene Murphy. The forensic laboratory examination report that is in the record before us reveals that the "male DNA profile from [the vaginal swabs from Lorene Murphy] matches Michael J. Marino.... The estimated frequency of this profile is one person in 4.7 quadrillion based on the relevant United States populations."

Marino was initially indicted on the charge of first-degree rape in this case, but the indictment was subsequently amended to include an additional charge of first-degree burglary. Marino moved to suppress the saliva sample that was taken from the cup and the laboratory report

containing the analysis of the saliva sample. Marino alleged that Detective Roby's act of obtaining the saliva sample from his cup without a warrant was an unconstitutional search, and that the court should suppress the fruits of this unconstitutional search. Marino also moved to suppress the blood sample taken from him. A suppression hearing was held, during which Detective Roby and others testified. The court ultimately denied Marino's motions to suppress.

Marino moved to enter a conditional guilty plea to the charges of first-degree rape and first-degree burglary in exchange for the Commonwealth's agreement to recommend sentences of fifteen years of imprisonment for each of those convictions. Marino's guilty plea was conditioned on his ability to appeal the circuit court's denials of his motions to suppress, as well as its denials of two motions to exclude he had filed. The court accepted Marino's guilty plea and sentenced him to fifteen years of imprisonment for the first-degree rape conviction and fifteen years of imprisonment for the first-degree burglary conviction, to be served concurrently. Marino now appeals the circuit court's denials of his motions to suppress the evidence obtained from the Styrofoam cup and the blood sample taken from him.

## II. STANDARD OF REVIEW

The Kentucky Supreme Court has stated:

When reviewing an order denying a motion to suppress, we consider the trial court's findings of fact "conclusive" if they are "supported by substantial evidence." RCr[2] 9.78. Using those facts [if supported], the reviewing court then conducts a *de novo* review of the trial court's application of law to those facts

---

**2.** Kentucky Rule of Criminal Procedure.

to determine whether the decision is correct as a matter of law.

*King v. Commonwealth,* 374 S.W.3d 281, 286 (Ky.2012) (internal quotation marks and citation omitted).

### III. ANALYSIS

 Marino contends that the circuit court erred in denying his motions to suppress the evidence obtained from the Styrofoam cup and also his blood sample. "Warrantless searches are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *King,* 374 S.W.3d at 286 (internal quotation marks and citation omitted). The abandoned property exception is one such exception. *See id.* (citations omitted).

> Individuals cannot have a reasonable expectation of privacy in property they abandon; thus, a search of abandoned property is not, without more, unreasonable. What constitutes abandoned property has to be determined on a case-by-case basis. [T]rial courts must weigh the evidence and consider the circumstances in reaching a conclusion as to whether the property has, in fact, been abandoned.

*Id.* at 286–87 (internal quotation marks and citations omitted). "[T]he act of abandonment itself turns to a large degree upon the possessor's state of mind." *Watkins v. Commonwealth,* 307 S.W.3d 628, 630 (Ky.2010) (citation omitted).

We begin our analysis with the saliva sample taken from the Styrofoam cup. It is important to note that, because it was taken from a cup, as opposed to being taken from Marino's person (such as a buccal swab of his inner cheek), the acquiring of this sample did not require any intrusion upon Marino's body and, therefore, did not automatically qualify as a search. *Cf. Maryland v. King,* —— U.S. ——, 133 S.Ct. 1958, 1968–69, 186 L.Ed.2d 1 (2013) (stating that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" because "[v]irtually any intrusio[n] into the human body . . . will work an invasion of cherished personal security that is subject to constitutional scrutiny[.]" (Internal quotation marks and citations omitted)).

 In the present case, when Marino left the Styrofoam cup on the table in the jail's library and returned to his jail cell, he relinquished any privacy interest that he might have had in the cup by abandoning it. Marino clearly knew that the cup would not remain indefinitely on the table and that someone would need to pick it up and dispose of it. When a person leaves his garbage in a location where a third party (*i.e.,* a stranger) will collect it, the person who left the garbage has "no reasonable expectation of privacy in the inculpatory items" and, therefore, he has no Fourth Amendment protection concerning them. *California v. Greenwood,* 486 U.S. 35, 40–41, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988); *see also Commonwealth v. Ousley,* 393 S.W.3d 15, 24 (Ky.2013). Further, we note that "we do not construe Section 10 of our Kentucky Constitution to extend a greater protection against warrantless searches than that afforded warrantless searches under the Fourth Amendment to the U.S. Constitution." *Watkins,* 307 S.W.3d at 630. "Under both Section 10 of the Kentucky Constitution and the Fourth Amendment to the U.S. Constitution, abandoned property is outside of constitutional protection." *Id.* (citation omitted).

The United States District Court for the District of Maryland summarized several cases that demonstrated how *Greenwood* applies in cases such as the one before us, where the suspect abandoned property

from which the police later collected the suspect's DNA. That Court stated:

> [T]he abandonment analysis in *Greenwood* has been applied to uphold against Fourth Amendment challenge[s to] "covert involuntary DNA sampling," a process in which police collect DNA—not from crime scenes—but from known persons who are suspected of crimes, for whom police do not have probable cause to seek a warrant to take a sample directly from them.... Thus, instead of taking a sample directly from the targeted individual's body, which would clearly implicate the Fourth Amendment, police obtain discarded, or "abandoned" items that are likely to contain the target's DNA, such as cigarette butts, coffee cups, or chewing gum. *See, e.g., Commonwealth v. Bly*, 448 Mass. 473, 862 N.E.2d 341, 356–57 (2007) (suspect connected to murder by DNA analysis of water bottle and cigarette butts he left behind after interview with police); *State v. Wickline*, 232 Neb. 329, 440 N.W.2d 249, 253 (1989) (police not required to obtain warrant to test cigarettes defendant left at police station because he "abandoned these items and sufficiently exposed them to the officer and the public to defeat his claim to [F]ourth [A]mendment protection"); *State v. Athan*, 160 Wash.2d 354, 158 P.3d 27 (2007) (no constitutional violation where police addressed phony class-action mailing to suspect in cold rape case and obtained suspect's DNA from saliva on return envelope: "The analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment.").

*United States v. Davis*, 657 F.Supp.2d 630, 649 (D.Md. 2009).

In the *Bly* case that was discussed in *Davis*, the defendant left behind a water bottle and cigarette butts after being interviewed by police, which were then DNA tested. The *Bly* Court noted the pertinent facts as follows:

> After being interviewed for two hours, smoking the cigarettes and drinking from the water bottle, Bly requested use of a telephone to consult with his mother. The detectives took him to another room in the same building in order to make use of a secure telephone line. Bly did not attempt to take the cigarette butts and water bottle with him when he left the interview room to travel within the building, and he did not request to go back and collect them after using the telephone, even when prompted.

*Bly*, 862 N.E.2d at 356. The cigarette butts and water bottle were then sent for DNA testing. *See id.* at 349 n. 3. The *Bly* Court held that "[t]here was no error in the denial of Bly's motion to suppress [the] physical evidence [because] no search or seizure occurred." *Bly*, 862 N.E.2d at 357.

■ The scenario in Marino's case is similar to those discussed in *Davis* and in *Bly*. While Detective Roby was attempting to interview him, Marino drank from a disposable cup. When Marino chose not to answer her questions and to end the interview, he left the library and returned to his jail cell, while leaving the disposable cup with his saliva in it on the table. As in *Bly*, there was no error in the circuit court denying Marino's motion to suppress the evidence from the Styrofoam cup because no search or seizure occurred in obtaining that physical evidence, due to the fact that Marino had abandoned it. Therefore, this claim is without merit.

Regarding the blood sample that was obtained from Marino pursuant to a search warrant, Marino merely argues in the "Conclusion" section of his brief that "not only must the lab results from the taking

of the Styrofoam cup be suppressed[,] but the results from the search and seizure of Mr. Marino's blood based on an affidavit for a search warrant that relied solely on the results from the test from the cup." He appears to argue that the blood test results were tainted as "fruit of the poisonous tree," because the search warrant to obtain his blood sample was based upon the saliva sample from the Styrofoam cup, which Marino contends was an unconstitutional search and seizure. However, because the taking of the saliva sample from the cup and testing it was not a search or a seizure, as discussed *supra*, and Marino acknowledges that the affidavit for the search warrant for his blood sample was based solely on the results from the test of the saliva in the cup, he has not shown that the search warrant was invalid or that the blood test results were "fruit of the poisonous tree." Consequently, this claim lacks merit.[3]

Accordingly, the judgment of the Nelson Circuit Court is affirmed.

ALL CONCUR.

---

**3.** Moreover, because Marino does not appeal the denial of his other motions that he had reserved the right to appeal by virtue of his conditional guilty plea, any claims he may have had concerning those motions have been waived. *See Grange Mut. Ins. Co. v. Trude,* 151 S.W.3d 803, 815 (Ky.2004).